Linda MALONE, Plaintiff,

v.

K–MART CORP., Defendant.

No. Civ.A. 98–D–467–S.

United States District Court,
M.D. Alabama,
Southern Division.

April 30, 1999.

---

Ann C. Robertson, Maury Steven Weiner, Birmingham, AL, for plaintiff.

Stephen E. Brown, Mitchell G. Allen, Carole A. Golinski, Birmingham, AL, for defendant.

### MEMORANDUM OPINION AND ORDER

DE MENT, District Judge.

Before the court is Defendant K–Mart Corporation's ("K–Mart") Motion For Summary Judgment As To All Of Plaintiff's Claims, along with its Brief In Support Of Motion For Summary Judgment ("Def.'s Br.") and Evidentiary Submission, filed on February 1, 1999. Plaintiff filed a Brief In Opposition To Defendant's Motion For Summary Judgment, which the court construes as a Response ("Pl.'s Resp."), along with her Evidentiary Submission In Opposition To Defendant's Motion For Summary Judgment, on February 17, 1999. Defendant filed a Reply Brief on February 24, 1999, and Plaintiff filed a Response To Defendant's Reply Brief, which the court construes as a Surreply, on March 5, 1999. After careful consideration of the arguments of counsel, the relevant law, and the record as a whole, the court finds that Defendant's Motion For Summary Judgment is due to be granted in part and denied in part.

### JURISDICTION AND VENUE

The court properly exercises subject matter jurisdiction over this action, pursuant to 28 U.S.C. §§ 1331, 1343(a)(4), 2201, and 2202, 42 U.S.C. §§ 2000e, et seq., 1981, and § 1981a. The Parties do not contest personal jurisdiction or venue.

### SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the court is to construe the evidence and factual inferences arising therefrom in the light most favorable to the nonmoving party. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). Summary judgment can be entered on a claim only if it is shown "that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c). As the Supreme Court has explained the summary judgment standard:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be no 'genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial.

*Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (citing Fed.R.Civ.P. 56(c)).

The trial court's function at this juncture is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (citations omitted). A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *See Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *see also Barfield v. Brierton,* 883 F.2d 923, 933 (11th Cir.1989).

The party seeking summary judgment has the initial burden of informing the court of the basis for the motion and of establishing, based on relevant "portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,'" that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Celotex,* 477 U.S. at 323, 106 S.Ct. 2548 (citing Fed. R.Civ.P. 56(c)). The mechanics of satisfying the initial burden vary, however, depending upon which party, the movant or the nonmovant, bears the burden of proof at trial. *See Fitzpatrick v. City of Atlanta,* 2 F.3d 1112, 1115 (11th Cir.1993) (detailing the nature of the parties' responsibilities when preparing or defending against a motion for summary judgment).

Once this initial demonstration under Rule 56(c) is made, the burden of production, not persuasion, shifts to the nonmoving party. The nonmoving party must "go beyond the pleadings and by [his or] her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548 (citing Fed.R.Civ.P. 56(e)). In meeting this burden, the nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Corp. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). That party must demonstrate that there is a "genuine issue for trial." Fed.R.Civ.P. 56(e); *see also Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348; *Anderson,* 477 U.S. at 249, 106 S.Ct. 2505. An action is void of a material issue for trial "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita,* 475 U.S. at 587, 106 S.Ct. 1348.

**FACTUAL BACKGROUND**

Plaintiff Linda Malone, an African-American female, began working for Defendant K–Mart at store No. 3082 in 1973 and continues to work for K–Mart. (Pl.'s Resp. at 1.) In 1982, Plaintiff became a pharmacy technician. (*Id.*) In 1982, Tommy Henig ("Henig"), a white male, began working at store No. 3082 as a pharmacist and as Plaintiff's supervisor. (*Id.* at 2.) After Henig had worked at the store for approximately three months, he began to make racially and sexually derogatory comments to Plaintiff on a daily basis, which continued throughout the fifteen years that he worked with Plaintiff.[1] (*Id.*)

1. Plaintiff prepared the following list of statements made by Henig in a memorandum for John Swanner, the store manager:

1. I have been called Stimie.
2. I have been told that I looked like Buckwheat.
3. He has made reference to the hair on my head looking like "cunt hair" (as meaning the hair on a persons vagina)[.]
4. On one occasion I was talking to other employees in the department where I work about having a nose job done and he stated

that, "you do not need a nose job done because your nose is flat enough.["]
5. I have been subjected to him telling Pharmacy students that I was a 30 something year old virgin and the reason I am not married is because I won't give it up and if I were too [sic] I would go crazy.
6. I have been subjected to him making statements to another pharmacist (not employed by K–Mart) that a family member died and left me an inheritance, and the only way I could get it is to have a baby for a white man.

Plaintiff claims that she complained "on many occasions to management employees regarding the harassment she was suffering at the hands of Henig." *(Id.* at 5.) Her complaints generally were ignored and nothing was done. For instance, Plaintiff complained to the pharmacy district manager, Owens Scott, "about the sexually and racially inappropriate manner in which Henig treated her" on "hundreds of occasions," but Henig's harassment continued "with the same force." *(Id.)* Further, Plaintiff was actively discouraged from complaining, such as when Carol Barbaree McKenny ("Barbaree") told Plaintiff that she did not like Plaintiff's complaining to the store manager. *(Id.)*

Plaintiff also complained directly to Henig about his mistreatment of her. *(Id.* at 6.) She "told Henig to stop it and that he was hurting her feelings and degrading her." *(Id.)* She also wrote a letter to Henig, "requesting that he stop harassing her." *(Id.)* In response, Henig laughed and continued his behavior. *(Id.)*

Prior to January 11, 1996, all of Plaintiff's complaints were made verbally. On January 11, 1996, Plaintiff for the first time complained in writing via a letter to John Swanner, the store manager, summarizing her complaints of Henig's continued harassment. *(Id.)* Swanner called Plaintiff within fifteen minutes of receiving the letter and told her that she was right, "that Henig's harassment had been going on for a long time and that they needed to do something to stop it." *(Id.* at 8.)

On January 15, 1996, Plaintiff met with Swanner and Jean Herman, the human resources manager. Swanner told Plaintiff that the pharmacy district manager, Tudor Jones, wanted a list of dates and time and things that were said. (Malone Dep., Ex. 11 at 2.) Plaintiff prepared a list and gave it to Swanner on January 19, 1996. (Pl.'s Resp. at 8; *see* n. 1, *supra.*) Swanner mailed the list to Jones on January 23, 1996. *(Id.)*

Jones investigated Plaintiff's complaint by interviewing Plaintiff and other K–Mart employees. Interviews with Swanner, Herman, and Barbaree revealed that they were aware of a long-term problem with Henig. (Pl.'s Resp. at 8–10; Kramer Dep. Ex. 7; Jones Dep. Ex. 1 at 19.) Through-

7. He constantly makes remarks about my weight in front of my co-workers.

8. There was an occasion when I was talking with a pharmacist in my deparment (who is no longer with K–Mart) about inviting some friends over to play cards when Mr. Henig made the statement, "what are y'all going to play? [ ]Spades."

9. I leaned over on one occasion to get something and the top of my breasts was showing and he made the statement in front of others "your tiddies [sic] are like little black puppies and they are making me sick, so cover them up.["]

10. He oftentimes tells "nigger jokes."

11. He has made the statement that every black man that comes to K–Mart must be a Reverend (if they are wearing a suit) because they can't be anything else.

12. He often talks about a Country Club in Montgomery, Alabama where blacks are not allowed to join and that if anyone who is a member brought a black person as a guest that[,] that member would no longer be a part of that club.

13. As recent as Monday[,] January 15, 1996[,] I was talking with two pharmacy co-workers about what I had cooked over the week-end. I told them that I had cooked some hog moll. We laughed about it and Tommy said, "that's as close as she would come to a mans [sic] testicles.["]

14. I was talking to a visiting pharmacist on one occasion when Tommy yelled at me and said, ["]take your head up from Regina's butt and get back to work.["] There were customers present also.

15. He talks about the hair on my face and tells me that I need to shave.

16. Tommy has made racial remarks about my being asked to go to a co-workers on New Years Day (1996). He said if I did I probably would get shot because of what that black man did to her husband on his job.

17. With regards to salary increase interviews[,] on one recent occasion Tommy stated that had he interviewed me[,] the score would have been worse. He also stated that had I found out about the average score given to a pharmacy co-worker[,] I would probably sue her (the interviewer). The store manager refused to sign the form unless the score was changed.

(Malone Dep., Ex. 5.)

out this investigation, no effort was made to ensure that Plaintiff and Henig did not work together. (Pl.'s Resp. at 9.) In fact, they continued to work together, and Henig continued to harass Plaintiff. (*Id.*)

Subsequent to the investigation, Henig was terminated on February 9, 1996. (*Id.* at 12.) Plaintiff claims that she was subjected to a racially hostile work environment subsequent to Henig's termination, "primarily at the hands of Carol Barbaree and the new store manager, Geary Dismukes, a white male." (*Id.* at 13.) Plaintiff references several instances of discrimination. First, Plaintiff claims that Barbaree heard a pharmacy employee use the word "nigger" twice while in Plaintiff's presence, but took no remedial action. (*Id.*) On one of these occasions, Plaintiff "said, Carol [Barbaree], and Carol just kind of like shook it off her shoulders like this, you know, didn't say anything." (*Id.*)

Second, Plaintiff claims that, in November 1996, a pharmacy employee and Dismukes made fun of names that black people give their children. (*Id.* at 13–14.) When Plaintiff spoke to Dismukes about this incident, "[h]e got very upset and screamed and shook his finger in my face and told me that I was the one that was prejudice [sic]. And that I saw everything as black and white and denied at first that he said it." (Malone Dep., Ex. 11.)

Third, Dismukes told Plaintiff that "it is her fault that the store has had trouble hiring pharmacists." (Pl.'s Resp. at 14.) Fourth, an African American assistant manager informed Plaintiff that Dismukes "asked her why she put up a Big Bird display in the infants department 'for those little black kids to tear down.'" (*Id.* at 15.)

The fifth incident concerns Plaintiff's performance evaluation. On December 12, 1996, Plaintiff was dissatisfied with her annual review. (*Id.*) Plaintiff met with Barbaree, then Barbaree raised Plaintiff's grade from a three to a four on a scale of five. (*Id.*) After the meeting, Plaintiff was still dissatisfied, but Barbaree was no longer receptive. (*Id.*) Specifically, Plaintiff

did not understand why she received a 3 in the category of "Job Knowledge" when previously she had received a 5, and the job duties had not changed. (*Id.*) Further, Plaintiff questioned why Barbaree did not receive input from employees with whom Plaintiff worked. Barbaree explained that the African–American employee had not been working on the day of the evaluation. (*Id.* at 16.) Barbaree also received input from Henig prior to his termination. (*Id.*) Barbaree further responded to Plaintiff that "I will not tolerate this having to back up and continue back and forth with this leaving letters and having to respond." (*Id.* at 16 (emphasis in original).) Barbaree sent Plaintiff to talk with Dismukes. (*Id.*) During their meeting, "Dismukes told Malone that she better be happy with the score she was given because if he had evaluated her, he would have given her a lesser score." (*Id.*)

The sixth event concerns a K–Mart breakfast for store associates who had five to twenty-five years of employment with K–Mart. (*Id.* at 17.) Several months prior to the breakfast, Plaintiff chose the gift she wished to receive and filled out the necessary paperwork. (*Id.*) Immediately before the breakfast, Herman informed Plaintiff that her gift and plaque had not arrived, stating that she did not know why. (*Id.*) At the breakfast, Plaintiff was the only person not to receive a gift. (*Id.*)

Finally, Dismukes informed Plaintiff that Barbaree refused to participate in Plaintiff's most recent performance evaluation. (*Id.*) Plaintiff complained to Herman, and subsequently Barbaree participated. (*Id.*) Also, Dismukes told Plaintiff that her co-workers considered her moody and a slow worker, but when Plaintiff questioned her co-workers, they denied making such comments. (*Id.*)

Plaintiff also claims that K–Mart did not post a sexual harassment policy until after February 1996. (Pl.'s Resp. at 20.) K–Mart did not have a racial harassment policy. (*Id.* at 20–21.) Further, K–Mart did not offer any training concerning

harassment prior to 1997. (*Id.* at 21.) K–Mart had an open-door policy. (*Id.* at 16.)

Plaintiff further claims that she did not receive the same pay as a white woman, Beverly Kennedy, working in the same capacity. (*Id.* at 17.) For instance, from June 1996 until December 1997 and from June through December 1998, Kennedy earned ten cents more per hour than Plaintiff. (*Id.*) K–Mart determines compensation primarily based on an employee's performance evaluation. (*Id.* at 18; Kramer Dep. at 135.) Both Henig and Barbaree gave input into Plaintiff's performance evaluations. (Pl.'s Resp. at 18; Kramer Dep. at 172.)

On January 22, 1996, Plaintiff wrote a letter to the Equal Employment Opportunity Commission ("EEOC"). (*Id.* at 18.) Plaintiff enclosed two documents with the letter, the January 11, 1996 letter to Swanner and the January 18, 1996 memorandum to Swanner that was sent to Jones. (*Id.* at 18–19.) Approximately three weeks later, Plaintiff called the EEOC's Birmingham office and was informed that it would take three to six months to process her charge. (*Id.* at 19.) Subsequently, Plaintiff called to inquire about the status of her complaint and was informed that the EEOC had not received her charge. (*Id.*) The EEOC eventually found Plaintiff's file underneath some other files, and the EEOC sent Plaintiff an Amended Charge. (*Id.* at 20.) The Amended Charge was entitled "Amended Charge" and stated that the Original Charge had been filed on January 24, 1996. (*Id.*) Plaintiff read the Amended Charge, signed it, and filed it with the EEOC on February 10, 1997. (*Id.*)

## DISCUSSION

### I. *TITLE VII HARASSMENT CLAIMS*

Defendant claims that "Plaintiff's Title VII racial harassment claim is entirely time-barred or, at a minimum, limited to harassment by Henig which occurred within 180 days of her letter to the EEOC." (Def.'s Br. at 17.) First, Defendant argues that Plaintiff's January 22, 1996 letter to the EEOC does not constitute a charge of discrimination. (*Id.* at 18.) Second, Defendant contends that, even if the January 22, 1996 letter does constitute a charge, Plaintiff's harassment claims are limited to the harassment which occurred within 180 days of receipt of said letter. (*Id.* at 21.) Third, Defendant contends that Plaintiff's Title VII harassment claims are limited to harassing acts perpetrated by Henig. (*Id.* at 28.) The court is unpersuaded by these arguments and finds that summary judgment on these issues is due to be denied.

### A. Whether Plaintiff's January 22, 1996 Letter To The EEOC Constitutes A "Charge"

On January 22, 1996, Plaintiff sent a letter to the EEOC ("EEOC letter"), which was received by the EEOC on January 24, 1996, stating:

I am writing to you, asking for a form to file a racial, sexual harassment complaint, with K–Mart co-operation [sic] and a pharmacist Thomas H. Henig. Enclosed is a letter in written [sic] I submitted to Kmart # 3082 store manager. In response, he ask [sic] for a list of my complaints. Enclosed are copies of the two letters I gave him, but they are the same things I have been complaining to him for 9 years of his manger's [sic] term and 14 years before to the manger [sic] before him and personel [sic] manger [sic]. I need your help please.

(Malone Dep., Ex. 6.) Enclosed with the EEOC letter were two attachments. One was the January 11, 196 letter from Plaintiff to John Swanner, which stated, in relevant part:

I have worked and been through a lot of changes with a lot of Pharmacists. But never, nothing as bad as working with Tommy Henig from day # 1 (one) I have dealt with mental, sexual and racial harassment. I am and have reached the (my) breaking point. I will no longer, as of today work under these conditions anymore. I will not be driven out of a

job I have been doing well for 23 years of experience.... Wed. January 10, 1996, Tommy call me a name, which I consider a racial slur, put down and degrating [sic]. I ask [sic] him not to call me that anymore, and preceded [sic] to tell him why not. So he said it again. So I enturn [sic] ask Carol [Barbaree, pharmacy manager] to tell him not to anymore. In response he told her that he would. So, I can't reason with him, and he won't listen to Carol. It really hurt my feeling[s], humiliated me and made me feel less than a person. We have discussed this in the past and nothing changed.

(Malone Dep. Ex. 4.) The second attachment was the memorandum Plaintiff prepared for and gave to Swanner on January 19, 1996. *See* n. 1, *supra.*

Defendant contends that the EEOC letter does not constitute a charge because Plaintiff "clearly did not intend her letter ... to serve as the charge itself. Rather, she wanted the forms so that she could file a formal charge if warranted in the future." (Def.'s Br. at 19.) Defendant argues, therefore, that Plaintiff did not file a charge with the EEOC until February 10, 1997, when she filed the Amended Charge.

Further, Defendant argues that the Amended Charge filed by Plaintiff was untimely. (*Id.*) In support of this argument, Defendant relies on the fact that Henig was terminated on February 10, 1996. Defendant contends that Henig was the alleged harasser, and thus when he was terminated, the alleged harassment ceased. (*Id.* at 18.) Therefore, because Plaintiff's Amended Charge was made more than 180 days after the alleged harassment, Defendant argues that it was untimely. (*Id.*) The court disagrees.

▮▮▮ Title 29 U.S.C. § 626(d)(1) requires a plaintiff to file an EEOC charge within 180 days after the alleged unlawful practice occurred. The requirement that an EEOC charge be timely filed is a condi-

tion precedent to the maintenance of a civil action under Title VII. *See Increase Minority Participation by Affirmative Change Today (IMPACT) v. Firestone,* 893 F.2d 1189, 1196 (11th Cir.1990). Generally, an EEOC charge should contain the following information:

(1) The full name, address, and telephone number of the person making the charge ...;

(2) The full name and address of the person against whom the charge is made, if known ...;

(3) A clear and concise statement of the facts, including pertinent dates, constituting the alleged unlawful employment practices ...;

(4) If known, the approximate number of employees of the respondent employer ...; and

(5) A statement disclosing whether proceedings involving the alleged unlawful employment practice have been commenced before a state or local agency charged with the enforcement of fair employment practice laws and, if so, the date of such commencement and the name of the agency.

29 C.F.R. § 1601.12(a). However, "[n]otwithstanding [the general rule], a charge is sufficient when the [EEOC] receives from the person making the charge a written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of." *Id.* at § 1601–12(b). Further, "[c]harges filed with the EEOC must be liberally construed because they are made by persons who are unfamiliar with the technicalities of formal pleadings and who usually do not have the assistance of an attorney." *Tillman v. City of Boaz,* 548 F.2d 592, 593 (5th Cir.1977)[2] (citations omitted). Additionally, "[w]eight and credibility should be given to the construction or meaning the EEOC gives to charges filed with them."

*Bonner v. City of Prichard,* 661 F.2d 1206, 1209 (11th Cir.1981) (en banc).

---

**2.** Decisions of the former Fifth Circuit rendered prior to October 1, 1981 constitute binding authority in the Eleventh Circuit. *See*

*Tillman,* 548 F.2d at 593 (citing *Macklin v. Spector Freight Sys., Inc.,* 478 F.2d 979 (D.C.Cir.1973)).

■ The issue before the court is whether Plaintiff's EEOC letter constitutes an EEOC charge pursuant to the aforementioned rules. The court finds that the EEOC letter, together with attachments, constitutes an EEOC charge because the Plaintiff's EEOC letter: (1) satisfies the requirements of 29 C.F.R. § 1601.12(b); (2) conveys Plaintiff's present intent to file an EEOC charge; and (3) was considered an EEOC charge by the EEOC.

Examination of the EEOC letter with its attachments demonstrates that, while each separate provision of 29 C.F.R. § 1601.12(a) is not satisfied, the requisites of § 1601.12(b) are met because the letter constitutes a "written statement sufficiently precise to identify the parties, and to describe generally the action or practices complained of." Specifically, Plaintiff's EEOC letter identifies K–Mart, Tommy Henig, and the store manager, and the attachments identify other K–Mart employees. Further, the EEOC letter and attachments describe many incidents of alleged harassment. *See, e.g., Brook v. City of Montgomery,* 916 F.Supp. 1193, 1200–1201 (M.D.Ala.1996) (finding that, "under the ADEA, any writing that contains the more-forgiving condition · of 29 C.F.R. § 1626.8(b) will suffice as a charge").

The court finds the instant matter to be akin to that in *Rabzak v. County of Berks,* 815 F.2d 17 (3d Cir.1987). In *Rabzak,* the court considered whether a letter to the EEOC constituted a charge. *Id.* The letter stated, in relevant part, that the plaintiff "would like to be directed to the office that would handle my particular concern regarding my right of employment," then outlined plaintiff's grievances. *Id.* at 19. The court held that this letter "constitute[s] a charge of unlawful discrimination complying with the requirement of the Act as a·condition of bringing suit." *Id.*

In reaching this conclusion, the *Rabzak* court considered and distinguished the case *Bihler v. Singer Co.,* 710 F.2d 96 (3d Cir.1983), wherein the *Bihler* court determined that the letter at issue was not sufficient to constitute an EEOC charge. The *Bihler* letter stated that the plaintiff was "ready, willing and able to continue my employment with Singer and I ask that remedial action be taken forthwith. I intend to institute legal procedures if satisfactory action is not taken by Singer." *Id.* at 98. The *Rabzak* court distinguished *Bihler* because the *Bihler* letter "sought reinstatement and merely threatened legal action if satisfactory action was not taken by the employer." 815 F.2d at 20. In the instant action, as in *Rabzak,* the court finds that the EEOC letter expresses Plaintiff's. intent to file a charge with the EEOC, rather than an intent to take an intermediary step with the mere possibility of future legal action.

Moreover, the EEOC treated Plaintiff's EEOC letter as a charge. After the EEOC misplaced and then found Plaintiff's letter, the EEOC sent Plaintiff a document entitled "Amended Charge." On the Amended Charge is written "Original Charge filed on January 24, 1996." (Malone Dep.Ex. 8.) Further, the Deputy District Director of the EEOC, Mr. Burris, stated that the EEOC considered the January 24, 1996 letter with attachments "to be sufficient to base a charge of discrimination." (Burris Aff. at 2.) Mr. Burris further stated that, ·"[w]hen the charge was amended and placed on the EEOC's Charge of Discrimination form in February 1997[,] the EEOC considered the date of the charge as being January 24, 1996, the date that the EEOC received the original charge. This was·done pursuant to 29 C.F.R. § 1601.12." (*Id.* at 2.) *See Moore v. Alabama State Univ.,* 945 F.Supp. 235, 239–240 (M.D.Ala.1996) (in finding that letter to EEOC constituted proper charge, court specifically noted that "the EEOC stated in its January 22, 1996 letter to Plaintiff that she 'filed [her] charge on March 29, 1994' ").

Defendant also argues that the EEOC letter "was deficient because it was not

sworn to and notarized as required by the regulations." (Def.'s Br. at 20.) Plaintiff contends that her February 10, 1997 Amended Charge, which is signed and verified, is sufficient to satisfy the requirements of 29 C.F.R. § 1601.9 and relates back to January 24, 1996, the date Plaintiff filed her Original Charge (the EEOC letter).

Title 29 C.F.R. § 1601.9 requires that "[a] charge shall be in writing and signed and shall be verified." Section 1601.12(b) provides, in relevant part, that:

> A charge may be amended to cure technical defects or omissions, including failure to verify the charge, or to clarify and amplify allegations made therein. Such amendments and amendments alleging additional acts which constitute unlawful employment practices related to or growing out of the subject matter of the original charge will *relate back* to the date the charge was first received. A charge that has been so amended shall not be required to be redeferred.

29 C.F.R. § 1601.12(b) (emphasis added).

The court finds that Plaintiff's February 10, 1997 Amended Charge constitutes an amendment to the Original Charge growing out of the subject matter of the Original Charge and, thus, relates back to the date the charge was first received. Further, the court finds that, because the Amended Charge was signed and verified, it cures any such defects in the Original Charge. *See, e.g., Georgia Power Co. v. EEOC,* 412 F.2d 462, 467 (5th Cir.1969).

Based on the substantive content of the EEOC letter with attachments as well as the EEOC's treatment of same, the court finds that Plaintiff's EEOC letter with attachments constitutes a charge and, therefore, was timely filed.

**B. Whether Plaintiff's EEOC Charge Is Limited To Harassment Which Occurred Within 180 Days Of EEOC's Receipt Of Charge**

Defendant argues that Plaintiff's Title VII claim is "barred as to discriminatory events that occurred more than 180 days before Plaintiff filed her 'charge' " because Plaintiff "believed she was being racially and sexually harassed in violation of her rights since the early eighties." (Def.'s Br. at 21.) Plaintiff claims that Defendant's alleged discriminatory acts constitute a continuing violation and are not time-barred. (Pl.'s Resp. at 36.) The court finds that a triable issue of material fact exists and, therefore, summary judgment on this issue is due to be denied.

■■■ Title VII permits an aggrieved employee to seek relief in federal court only where the plaintiff has (1) filed timely charges with the EEOC and (2) received and acted upon the EEOC's statutory notice of right-to-sue. *See* 42 U.S.C. § 2000e–5(f)(1); *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 798, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). Concerning the first requirement, the plaintiff is required to file a charge of discrimination with the EEOC within 180 days of the alleged discrimination. *See* 42 U.S.C. § 2000e–5(e). If the plaintiff fails to file before this time elapses, the plaintiff's claim is untimely and, therefore, the plaintiff is procedurally barred for failure to exhaust her administrative remedies. *See Delaware State College v. Ricks,* 449 U.S. 250, 256, 101 S.Ct. 498, 66 L.Ed.2d 431 (1980); *Everett v. Cobb County Sch. Dist.,* 138 F.3d 1407, 1410 (11th Cir.1998).

■■■ The Supreme Court has recognized that the filing of a timely charge is "a requirement that, like a statute of limitation, is subject to waiver, estoppel, and equitable tolling." *Zipes v. Trans World Airlines,* 455 U.S. 385, 393, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982). An exception to the 180–day filing requirement arises where the discriminatory act(s) constitutes a "continuing violation." *See, e.g., Patterson v. Augat Wiring Sys., Inc.,* 944 F.Supp. 1509, 1517 (M.D.Ala.1996) (citing *Calloway v. Partners Nat'l Health Plans,* 986 F.2d 446, 449 (11th Cir.1993)). Pursuant to the continuing violation doctrine, "[w]here an employee charges an employer

with continuously maintaining an illegal employment practice, he [or she] may file a valid charge of discrimination based upon that illegal practice until 180 days after the last occurrence of an instance of that practice." *Beavers v. American Cast Iron Pipe Co.*, 975 F.2d 792, 796 (11th Cir.1992). "[T]he timely discrimination alleged by the plaintiff cannot simply be a perpetuation of the effects of the past discriminatory acts." *Bush v. Liberty Nat'l Life Ins. Co.*, 12 F.Supp.2d 1251, 1257 (M.D.Ala.1998) (citations omitted).

■■■ To determine whether alleged discriminatory acts constitute a continuing violation, the Fifth Circuit in *Berry v. Board of Supervisors of L.S.U.*, 715 F.2d 971 (5th Cir.1983), articulated a three-prong test, whereby the following nonexhaustive factors are to be examined:

> The first is subject matter. Do the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation? The second is frequency. Are the alleged acts recurring ... or more in the nature of an isolated work assignment or employment decision? The third factor, perhaps of most importance, is degree of permanence. Does the act have the degree of permanence which should trigger an employee's awareness of and duty to assert his or her rights, or which should indicate to the employee that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate?

*Id.* at 981. The *Berry* court noted that "the particular context of individual employment situations requires a fact-specific inquiry by a trial judge which cannot be easily reduced to a formula." *Id.* at 981–982. This court finds the *Berry* rubric to be instructive in determining whether alleged discriminatory acts constitute a continuing violation and applies it to the present case.[3]

Plaintiff claims that she was subjected to hostile work environment harassment. Generally, Alabama federal district courts have found such claims to constitute continuing violations. *See Morrow v. Auburn Univ. at Montgomery*, 973 F.Supp. 1392 (M.D.Ala.1997); *Patterson*, 944 F.Supp. at 1509; *Quillen v. American Tobacco Co.*, 874 F.Supp. 1285 (M.D.Ala.1995); *Saville v. Houston County Healthcare Auth.*, 852 F.Supp. 1512 (M.D.Ala.1994); *see also Lane v. Ogden Entertainment, Inc.*, 13 F.Supp.2d 1261, 1271–1272 (M.D.Ala.1998) (stating that "[a]pplication of ... the continuing violation theory is most appropriately applicable to hostile work environment claims, where the claim at issue is not based on discrete acts, but is based on an ongoing pattern of offensive conduct").

None of these cases, however, focuses on the permanence factor, that is, whether the plaintiff's awareness triggered a duty to assert her rights. *See Morrow*, 973 F.Supp. at 1401; *Patterson*, 944 F.Supp. at 1517; *Quillen*, 874 F.Supp. at 1292; *Saville*, 852 F.Supp. at 1521. In contrast, here, the sole focus is on whether such a duty was triggered. Defendant contends

---

3. The court notes that the Eleventh Circuit adopted the *Berry* test in Part C of its opinion in *Roberts v. Gadsden Mem'l Hosp.*, 835 F.2d 793 (11th Cir.1988) ("*Roberts I*"), stating that:

> It is only when a substantial nexus exists between a timely-filed claim and an otherwise time-barred claim that they may be viewed as constituting a single violation, part of which falls within the limitations period.... In determining the existence vel non of such a nexus, a court should not rely upon a superficial factual analysis, but rather, should refer to a variety of factors. Such factors include whether the claims

were related in subject matter, frequency, and permanence (i.e., whether the act was sufficiently permanent in nature so as to "trigger an employee's awareness of and duty to assert his or her rights"). *Berry v. Board of Supervisors of L.S.U.*, 715 F.2d 971, 981 (5th Cir.1983).

*Id.* at 800. *Roberts I* was amended by the Eleventh Circuit on sua sponte reconsideration in *Roberts v. Gadsden Mem'l Hosp.*, 850 F.2d 1549 (11th Cir.1988) ("*Roberts II*"), wherein the court withdrew Part C of *Roberts I* in its entirety. *Id.* at 1551. Accordingly, this court refrains from stating that the Eleventh Circuit has adopted the *Berry* analysis.

that Plaintiff "believed she was being racially and sexually harassed in violation of her rights since the early eighties." (Def.'s Br. at 21.) As evidence thereof, Defendant notes that "Plaintiff testified that she verbally complained about Henig's racial and sexual harassment to every store manager, pharmacy manager and pharmacy district manager.... In addition, Plaintiff testified that she complained on a weekly basis of the harassment to the personnel manager since the harassment began in 1982...." (*Id.* at 21–22.) Thus, Defendant claims, Plaintiff's allegations do not constitute a continuing violation because Plaintiff was aware that Henig's conduct was unlawful, yet she failed to file an EEOC charge earlier. (*Id.* at 28.)[4]

 "[H]ostile work environment harassment generally has a lesser degree of permanence than traditional disparate treatment discrimination." *Otis v. Wyse*, No. 93–2349, 1994 WL 566943, at *4, 1994 WL 566943 (D.Kan. Aug. 24, 1994) (citing *Waltman v. International Paper Co.*, 875 F.2d 468, 476 (5th Cir.1989); *Purrington v. University of Utah*, 996 F.2d 1025, 1028–1029 (10th Cir.1993)). In a hostile work environment harassment case, "the employee would be alerted to a hostile work environment claim only after the acts of harassment were sufficiently severe or pervasive to alter the terms or conditions of her employment ..." *Id.* Additionally, "a hostile work environment plaintiff typically will not be 'alerted' to her Title VII rights until the employer fails to take appropriate corrective actions." *Id.*

 The court finds an issue of fact to exist concerning when, if ever, the alleged discriminatory acts created the degree of permanence which should have triggered Plaintiff's awareness of and duty to assert her rights, or which should have indicated to Plaintiff that the continued existence of the adverse consequences of the act is to be expected without being dependent on a continuing intent to discriminate. *See Waltman*, 875 F.2d at 468 (finding that, where plaintiff alleged she was subjected to hostile work environment harassment and complained to employer, "there [was] a material issue whether the acts of sexual harassment[ ] had the Berry quality of 'permanence' that would alert [plaintiff] that her rights had been violated").

In support of this finding, the court notes that Plaintiff does not allege that Defendant took any adverse employment action against her. Specifically, Plaintiff does not allege that she was transferred, demoted, discharged, or denied a promotion as a result of Henig's discriminatory animus. Thus, the court finds that Defendant's actions lacked permanence, and that the alleged ongoing pattern of harassment was not "the kind of violation that—like a discrete instance of discriminatory conduct—would put a worker on notice that his [or her] rights had been violated." *Huckabay*, 142 F.3d at 239; *see also West*, 45 F.3d at 756 (stating that "the harassment did not cause a discrete event such as a lost job or a denied promotion and, thus, it did not trigger a duty of the

---

4. Plaintiff fails to respond directly to Defendant's argument. Rather, Plaintiff claims that hostile work environment harassment is an ongoing violation, and the 180 days does not begin to run during the commission of the violation. (Pl.'s Resp. at 35.) Thus, "[t]he question of whether a plaintiff was aware that the challenged conduct was illegal prior to the limitations period" is not relevant because the discriminatory act "has not yet concluded." (*Id.*)

The court disagrees. Pursuant to *Berry*, alleged discriminatory acts cannot be considered a continuing violation *unless* the degree-of-permanence factor has been addressed.

Plaintiff's argument seems to promote adoption of a per se rule that hostile work environment claims are continuing violations, regardless of the permanence factor. Although the court agrees that "[t]here is a natural affinity" between hostile work environment and continuing violation claims, *West v. Philadelphia Elec. Co.*, 45 F.3d 744, 755 (3d Cir.1995), the court declines to adopt such a per se rule. *See Id.* at 755; *Huckabay v. Moore*, 142 F.3d 233, 239 (5th Cir.1998). Rather, the court finds consideration of the permanence factor to be integral to determination of whether alleged discriminatory acts constitute a continuing violation.

plaintiff to assert his rights arising from that deprivation").[5]

Moreover, the court finds it significant that, according to Plaintiff, Defendant did not post a harassment policy until 1996, "[a]fter everything happened." (Malone Dep. at 113.) Further, the employee handbook Plaintiff received did not, to Plaintiff's recollection, contain a sexual harassment policy. (Pl.'s Resp. at 20.) Further, K–Mart has never had a racial harassment policy. Thus, such policies were not available to serve as a trigger to impose a duty on Plaintiff to assert her rights.

The court notes that other courts have found the requisite degree of permanence to exist, and have thus imposed a duty on a plaintiff, in circumstances where the plaintiff alleged hostile work environment harassment and where the plaintiff had previously complained to the employer. *See, e.g., Provencher v. CVS Pharmacy Div. of Melville Corp.*, 145 F.3d 5 (1st Cir.1998); *Galloway v. General Motors Serv. Parts Operations*, 78 F.3d 1164 (7th Cir.1996); *Bell v. Chesapeake & Ohio Ry. Co.*, 929 F.2d 220 (6th Cir.1991). Under the circumstances of the present case, however, the court finds a triable question of fact to exist concerning the degree of permanence and whether Plaintiff's awareness level was such that a duty to assert her rights was triggered. *See Martin v.*

*Nannie & The Newborns, Inc.*, 3 F.3d 1410, 1416 (10th Cir.1993) (holding that, where the first two *Berry* factors (similarity and frequency) are satisfied but the third (degree-of-permanence) is not, "given the analysis under the first two factors, we believe that [plaintiff] has shown enough to avoid summary judgment on the statute of imitations issue"). Thus, this court declines to impose such a duty on Plaintiff and, for the reasons heretofore stated, finds that summary judgment on this issue is due to be denied.

Upon proper motion by Defendant at the close of Plaintiff's case at trial, however, the court will reexamine this issue. At such time, the court will determine whether, as a matter of law, Plaintiff was under a duty to assert her rights more than 180 days prior to the filing of her EEOC charge. If appropriate, the court will again reexamine this issue at the close of Defendant's case, and, if necessary, upon a motion for new trial, fully briefed, by Defendant.[6]

**C. Whether Plaintiff's Title VII Harassment Claims Are Limited To Harassment Perpetrated By Henig**

Defendant argues that Plaintiff's Title VII harassment claims are limited to alleged acts of harassment perpetrated by Henig. (Def.'s Br. at 28.) First, Defen-

---

**5.** The Eleventh Circuit has stated that "[a] claim arising out of an injury which is 'continuing' only because a putative plaintiff knowingly fails to seek relief is exactly the sort of claim that Congress intended to bar by the 180–day limitation period." *Roberts II*, 850 F.2d at 1550; *see also Bush*, 12 F.Supp.2d at 1257. In both *Roberts II* and *Bush*, however, adverse employment actions occurred and, therefore, the court finds these cases to be distinguishable from the instant matter. *See Roberts*, 835 F.2d 793, 800, *modified by Roberts II*, 850 F.2d at 1549 (plaintiff did not receive a promotion opportunity on fair terms); *Bush*, 12 F.Supp.2d at 1257 (plaintiff demoted).

**6.** The court notes that, during the pretrial conference held in chambers on April 15, 1999, Plaintiff's counsel indicated that Plain-

tiff had sought legal representation before obtaining her current counsel and prior to filing her Original Charge with the EEOC. No mention of this was made in any of the written materials before the court. At this point, too much water has passed under the bridge to now revisit the court's tedious and lengthy evaluation of the facts in making the determination of whether alleged discriminatory events occurring prior to 180 days before the filing of Plaintiff's Original EEOC Charge should remain viable in this case. Candidly, however, the court was surprised by Plaintiff's counsel's admission and believes that, arguably, such could constitute evidence that Plaintiff was aware, or should have been aware, that she had a legal claim prior to when she filed her Original Charge. Thus, Plaintiff may have had a duty to assert her legal rights prior to when she did.

dant claims that the events that occurred subsequent to Henig's termination "were clearly insufficient to create a hostile environment within the meaning of the law." (*Id.*) Because the court finds that a continuing violation exists as to Plaintiff's Title VII harassment claims (*see* § I.B., *supra*), the court need not determine whether the events that occurred by other actors subsequent to Henig's termination are, by themselves, sufficient to constitute hostile work environment harassment.

■ Second, Defendant argues that the events that occurred subsequent to Henig's termination are beyond the scope of Plaintiff's Title VII charge. (*Id.*) The court notes, however, that Plaintiff's EEOC letter states, "I am writing to you, asking for a form to file a racial, sexual harassment complaint, *with K–Mart [Corporation]* and a pharmacist[ ] Thomas H. Henig." (Malone Dep.Ex. 6 (emphasis added).) Further, the EEOC charge and attachments include information concerning K–Mart's alleged failure to act in response to Plaintiff's complaints. (Malone Dep.Ex. 4.) Thus, the EEOC charge with attachments facially encompasses acts perpetrated both by K–Mart and Henig, and the court finds that summary judgment on this issue is due to be denied.

## II. SECTION 1981 HARASSMENT CLAIM

### A. Whether Plaintiff's § 1981 Racial Harassment Claim Is Time–Barred For Alleged Acts Of Discrimination Occurring More Than Two Years Prior To The Complaint

■ The statute of limitations for claims brought pursuant to 42 U.S.C. § 1981 is equal to the state statute of limitations for personal injury claims, which in Alabama is two years.[7] *See Baker v. Gulf & Western Indus., Inc.,* 850 F.2d 1480, 1482 (11th Cir.1988) (citing *Goodman v. Lukens Steel Co.,* 482 U.S. 656, 107 S.Ct. 2617, 96 L.Ed.2d 572 (1987)); Ala.Code § 6–2–38 (1975). Defendant argues that Plaintiff's § 1981 harassment claim is time barred because "Plaintiff has not been subject to any actionable racial harassment since Henig's discharge on February 10, 1996," more than two years prior to the filing of the Complaint. (Def.'s Br. at 12) The harassing events to which Plaintiff claims she was exposed subsequent to Henig's termination do not, according to Defendant, "rise to the level of creating a hostile environment." (*Id.* at 13.)

Plaintiff contends that "the racial harassment suffered by [her] in violation of § 1981 is subject to the . . . continuing violation law" and, therefore, her § 1981 claims are not time-barred. (Pl.'s Resp. at 44.) The court finds that the continuing violation doctrine does not apply, summary judgment is due to be granted, and Plaintiff's § 1981 racial harassment claims concerning alleged discriminatory acts occurring more than two years prior to the filing of Plaintiff's Complaint are due to be dismissed.

Courts in the Eleventh Circuit have applied the continuing violation doctrine to § 1981 claims. *See, e.g., Gonzalez v. Firestone Tire Rubber Co.,* 610 F.2d 241, 250 (5th Cir.1980) (holding that § 1981 claim barred unless plaintiff could show that defendant continued to engage in discriminatory practices within two years of filing suit); *Lane,* 13 F.Supp.2d at 1270 (applying continuing violation doctrine to § 1981 claims); *Patterson,* 944 F.Supp. at 1518 (same); *see also Beasley v. Alabama State Univ.,* 966 F.Supp. 1117, 1129 (M.D.Ala. 1997) (citing *Perez v. Laredo Junior College,* 706 F.2d 731, 733 (5th Cir.1983)).[8] As

---

**7.** Unlike Title VII, § 1981 has no administrative exhaustion requirement. *See Caldwell v. National Brewing Co.,* 443 F.2d 1044, 1046 (5th Cir.1971) (stating that a plaintiff "has an independent remedy under § 1981 without respect to exhaustion under Title VII"); *Jackson v. Motel 6 Multipurpose, Inc.,* 130 F.3d 999, 1007 (11th Cir.1997). Thus, a § 1981 plaintiff must file her complaint within two years of the last alleged discriminatory act, whereas a Title VII plaintiff must file the complaint within two years of a timely-filed EEOC charge.

**8.** The court notes that the cases cited by Plaintiff in support of her contention do not address the continuing violation doctrine in the context of § 1981 claims. *See Calloway,*

discussed above, pursuant to the continuing violation doctrine, an act of alleged harassment must have occurred within the statute of limitations period, two years of the filing of the Complaint for § 1981 claims. Here, the acts allegedly committed by Henig occurred more than two years prior to the filing of the Complaint, and only the alleged subsequent harassing events perpetrated by various other K–Mart employees occurred within two years of the filing of Plaintiff's Complaint.[9] Thus, the issue before the court is whether these subsequent events constitute part of a continuing violation with Henig's alleged acts.

■■■ Applying the *Berry* factors delineated above, the court finds that the seven harassing events that occurred subsequent to Henig's termination do not comprise part of a continuing violation with Henig's discriminatory acts. The first *Berry* factor concerns subject matter and asks, "[d]o the alleged acts involve the same type of discrimination, tending to connect them in a continuing violation?" *Berry*, 715 F.2d at 981. The court answers this question in the negative. Specifically, the court finds that, with regard to the seven harassing events subsequent to Henig's termination, Plaintiff has failed to show that they were all motivated by racial animus. For instance, with regard to K–Mart's failure to have a gift for Plaintiff at the awards-breakfast, the court fails to see how this allegation constitutes racial harassment. *Cf. Martin*, 3 F.3d at 1415 (finding first *Berry* factor to be satisfied where "*all* the incidents alleged by the plaintiff involved sexual harassment") (emphasis added). Further, the alleged harassment was perpetrated by different actors. Moreover, the alleged harassment of the subsequent events was of a different nature

from that perpetrated by Henig: whereas Henig's attacks were directed toward and substantively concerned Plaintiff, most of the subsequent events did not.

The second *Berry* factor concerns frequency and inquires, "[a]re the alleged acts recurring ... or more in the nature of an isolated work assignment or employment decision?" *Berry*, 715 F.2d at 981. The court finds that the seven subsequent harassing incidents, which occurred over the course of approximately two years, were more in the nature of isolated events. *See, e.g., Kolnicki v. Ford Motor Co.*, No. 94 C 7573, 1995 WL 431185, at *7 (N.D.Ill. July 17, 1995) (finding that second *Berry* factor not satisfied where there was a "significant temporal separation between these events"). Further, Henig's alleged discriminatory acts occurred on a daily basis, whereas the subsequent events occurred much less frequently—thus, the rate of frequency of the subsequent events is distinguishable on this basis as well.

Based on the foregoing, the court finds that Plaintiff's § 1981 claims are time-barred as to alleged discriminatory violations occurring more than two years before the filing of the Complaint.

**B. Whether Alleged Discriminatory Acts Subsequent To Henig's Termination Constitute Hostile Work Environment Harassment**

Plaintiff claims that a hostile work environment ensued even subsequent to Henig's termination, and she references seven events in support of this contention.[10] Defendant argues that these events do not constitute a hostile work environment. (Def.'s Br. at 14.) The court finds that these events constitute a hostile work envi-

---

986 F.2d at 449; *Beavers*, 975 F.2d at 796; and *Roberts I*, 835 F.2d at 800–801.

9. The alleged discriminatory acts committed subsequent to Henig's termination and within two years of the filing of the Complaint are, in sum: (1) the "nigger" incident; (2) the black-names incident; (3) the blaming incident; (4)

the Big Bird display incident; (5) the performance evaluation incident; (6) the award-breakfast incident; and (7) the Barbaree incident. *See* FACTS section, *supra*.

10. *See* n. 9, *supra; see also* FACTS section, *supra*.

ronment and, therefore, summary judgment on this issue is due to be denied.

■ "To prevail on her hostile work environment claim, the plaintiff must establish that: (1) she belongs to a protected class; (2) she was subjected to unwelcome racial harassment; (3) the harassment was based on race; and (4) the harassment affected a term, condition or privilege of employment." *Ellis v. Wal–Mart Stores, Inc.*, 952 F.Supp. 1522, 1526 (M.D.Ala. 1996) (citing *Henson v. City of Dundee*, 682 F.2d 897, 903–905 (11th Cir.1982)).[11] At issue here is whether the alleged harassment affected a term or condition of employment.

■ In *Faragher v. City of Boca Raton*, the Supreme Court stated that "conduct must be extreme to amount to a change in the terms and conditions of employment. . . ." 524 U.S. 775, 118 S.Ct. 2275, 2284, 141 L.Ed.2d 662 (1998). To affect the terms or conditions of employment by creating a hostile environment, a plaintiff "must show that the hostility was sufficiently pervasive to alter the conditions of employment and create an abusive working environment." *Perryman v. West*, 949 F.Supp. 815, 820 (M.D.Ala.1996) (citing *Edwards v. Wallace Community College*, 49 F.3d 1517, 1521 (11th Cir. 1995)). "[W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 23, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993). Factors to examine include, but are not limited to, "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* Moreover, "[a] term or condition of employment may

be said to have been affected if there is a 'demonstrable adverse impact on future employment opportunities or performance.'" *Perryman*, 949 F.Supp. at 819 (citation omitted).

■ Examination of the seven events suffered by Plaintiff subsequent to Henig's termination reveals that the totality of events constitutes a hostile work environment. For instance, the events concerning Plaintiff's performance evaluations, if proven, would have a demonstrable adverse impact on future employment opportunities. Negative performance evaluations could impact future job opportunities as well as future pay rates. Further, management's unwillingness to evaluate Plaintiff, as demonstrated by Barbaree, could be indicative of its unwillingness to promote her. Also, if Plaintiff must resort to battling over every performance evaluation to receive the scores she feels she deserves, her future job performance undoubtedly would be impacted.

The court also finds that many of the seven events were humiliating. For example, Barbaree permitted the word "nigger" to be used in Plaintiff's presence without doing anything about it, even when Plaintiff looked directly at her and asked for her assistance. (Pl.'s Resp. at 13.) Also humiliating were the racially derogatory comments made about black children's names and the Big Bird display.[12]

The court further finds that conditions of employment were affected when Barbaree and Dismukes reprimanded Plaintiff for exercising K–Mart's open-door policy. (Pl.'s Resp. at 16.) For instance, when Plaintiff questioned Barbaree about her performance evaluations, Barbaree wrote a letter to Plaintiff stating, "I will *not* tolerate this having to back up and continue

---

11. Although *Ellis* concerns Title VII, the court notes that the allocation of burdens and elements of a prima facie case is the same for employment claims brought pursuant to Title VII and § 1981. *See Patterson v. McLean Credit Union*, 491 U.S. 164, 186, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989); *Howard v. BP Oil Co.*, 32 F.3d 520, 524 n. 2 (11th Cir.1994).

12. Although the Big Bird display comments were not made to Plaintiff, the court notes that "[a] plaintiff may have a viable hostile environment claim even if the racial remarks were not directed at her." *Edwards*, 49 F.3d at 1522 (citation omitted).

back and forth with this leaving letters and having to respond." (Barbaree Dep.Ex. 3.) Further, Plaintiff claims that Dismukes blamed her for staffing problems, which supposedly resulted from Plaintiff's complaints concerning Henig's discriminatory treatment of her.

Based on the foregoing, the court finds that Plaintiff's allegations of discriminatory incidents that occurred subsequent to Henig's termination, if proven, *in toto* constitute hostile work environment harassment pursuant to § 1981, and that summary judgment on this issue is due to be denied.

### III. *RETALIATION CLAIMS*

 In Count Two of her Complaint, Plaintiff alleges that Defendant "retaliated against the plaintiff for protesting racial and sex harassment by giving her poor performance evaluations and blaming her for staffing problems in violation of Title VII and 42 U.S.C. § 1981." (Compl.¶ 27.) To establish a prima facie case of retaliation pursuant to Title VII and § 1981, a plaintiff must demonstrate that: (1) she engaged in statutorily protected expression; (2) there was a subsequent adverse employment action; and (3)

there is a causal link between the protected expression and the adverse action. *See Barge v. Anheuser–Busch, Inc.,* 87 F.3d 256, 259 (8th Cir.1996) (Section 1981); *Merriweather v. Alabama Dep't of Pub. Safety,* 17 F.Supp.2d 1260, 1273 (M.D.Ala. 1998) (Title VII). "Once the plaintiff establishes a prima facie case, the burden shifts to the employer to provide a legitimate, non-discriminatory reason for the adverse employment action. (Citation omitted) If this burden is satisfied, the plaintiff must then show that the employer's proffered reason is a pretext for retaliation." *Merriweather,* 17 F.Supp.2d at 1267. The court finds that Plaintiff's retaliation claims are due to be dismissed because Plaintiff fails to establish a prima facie case.

 Specifically, the court finds that Plaintiff fails to meet her burden with regard to the second factor, adverse employment action. Although the court finds that the events that happened subsequent to Henig's termination *together* constitute an adverse employment action, *see* § II.B., *supra,* the court finds that the performance evaluation incidents and the blaming incident absent the other events do not create an adverse employment action.[13]

---

**13.** The court considers only the performance evaluation incidents and the blaming incident for two reasons. First, they are the only two referenced by Plaintiff in the context of retaliation in the Complaint. *See* Compl. ¶ 27 (stating that "Defendant also retaliated against the plaintiff for protesting racial and sex harassment by giving her poor performance evaluations and blaming her for staffing problems....").

Additionally, the court finds the other events to be too temporally remote from the protected activity to satisfy the third factor, causality. "[W]here a substantial period of time has elapsed between the two events— engagement in the protected activity and the adverse employment action—the causal connection is less likely to exist absent evidence demonstrating a connection between the two events." *Breech v. Alabama Power Co.,* 962 F.Supp. 1447, 1461 (S.D.Ala.1997), *aff'd,* 140 F.3d 1043 (11th Cir.), *cert. denied,* — U.S. ——, 119 S.Ct. 117, 142 L.Ed.2d 94 (1998). The subsequent events began occurring in November 1996 (Pl.'s Resp. at 13), approximate-

ly ten months after Plaintiff made her Original Charge to the EEOC in January 1996. The court finds that the subsequent events were "not temporally close enough to support an inference of causal connection." *Id.* (finding no causal connection where more than a year passed between protected activity and discharge); *see also Valdez v. Mercy Hosp.,* 961 F.2d 1401, 1403 (8th Cir.1992) (no retaliation found where six months passed between protected activity and termination) (superseded by statute on other grounds); *Leslie v. Mobile Transit Auth.,* 963 F.Supp. 1142 (S.D.Ala.1997) (no causal connection where more than one year elapsed between protected activity and adverse employment action); *Balletti v. Sun–Sentinel Co.,* 909 F.Supp. 1539, 1549 (S.D.Fla.1995) (no causal connection where six months had elapsed between protected activity and discharge); *Juarez v. Ameritech Mobile Communications, Inc.,* 746 F.Supp. 798, 804 (N.D.Ill.1990), *aff'd,* 957 F.2d 317 (7th Cir.1992) (six months between complaint and termination too remote). Further, the court finds there to be insufficient evidence before the court linking these other

For instance, Plaintiff's 1996 performance evaluation was very good, giving Plaintiff a 4 on a scale of 5 in almost all categories, and did not fall below the "meets expectations" range. The court finds that this performance evaluation does not constitute a negative performance evaluation. *See Merriweather*, 17 F.Supp.2d at 1275 (finding that plaintiff's evaluation did not constitute adverse employment action where scores were not negative since the lowest score fell within the high end of the "meets expectations" range).

Additionally, the court finds that Barbaree's initial refusal to participate in Plaintiff's evaluation coupled with Dismukes' comment to Plaintiff blaming her for staffing problems are insufficient to constitute an adverse employment action. These incidents are qualitatively different from those suffered by the plaintiff in *Wideman v. Wal–Mart Stores, Inc.*, 141 F.3d 1453, 1456 (11th Cir.1998). In *Wideman*, the following incidents occurred:

> First, ... the day after [Wideman] informed management that she had filed an EEOC charge, she was improperly listed as a no-show on a day she was scheduled to have off. Wideman discovered the error when she went into the Wal–Mart to shop. When she brought the error to the attention of her manager, Mark Telfer, he required her to work anyway without a lunch break. Second, ... Telfer gave Wideman written reprimands. After the second reprimand, she received a one-day suspension. In her previous eleven months of employment at Wal–Mart she had not received any reprimands. Third, ... Telfer began soliciting employees at Wal–Mart for negative statements concerning Wideman. According to Wideman, Telfer did not seek statements from em-

ployees who would have given positive comments about her. Fourth, ... Wideman reported to work and found she had not been scheduled to work. When she announced her intention to call Wal–Mart headquarters to find out why, Assistant Manager Rene Willemain threatened to shoot her in the head. Fifth, ... while she was working at Wal–Mart, Wideman suffered an allergic reaction which required medical treatment. Although Wal–Mart Assistant Manager Audrey Nichols was aware that Wideman needed treatment, she needlessly delayed authorizing that medical treatment.

141 F.3d at 1455. The court finds the harassing acts in *Wideman* to be significantly more severe than the performance evaluation incidents and the blaming incident. Accordingly, the court finds that Plaintiff has failed to satisfy her prima facie burdens, and that summary judgment on this claim is due to be granted.

## IV. *DISCRIMINATORY PAY CLAIMS*

Plaintiff claims that Defendant discriminated against her "based on her race in compensation and other terms, conditions, and privileges of employment," thereby violating Title VII and § 1981. (Compl.¶ 26.) As explained below, the court finds that summary judgment is due to be granted as to Plaintiff's Title VII claim and denied as to the § 1981 claim.

### A. Title VII

Defendant first claims that Plaintiff's disparate wage claim pursuant to Title VII is due to be dismissed because Plaintiff failed to exhaust the requisite administrative remedies. (Def.'s Br. at 46.) Specifically, Plaintiff failed to file an

---

events to Plaintiff's protected activity to overcome their temporal remoteness.

Although the performance evaluation incidents occurred approximately ten months subsequent to Plaintiff's protected activity, the court considers these events to not be too temporally remote because they occurred during the first round of performance evaluations

conducted subsequent to Henig's termination. Further, although the blaming incident took place approximately ten months after Plaintiff's protected activity, the court considers it because there is a clear connection between Dismukes' comment and Plaintiff's protected activity.

EEOC charge claiming disparate pay based on race. (*Id.*) Plaintiff fails to rebut this argument. The court finds that Plaintiff has not satisfied her burden pursuant to Federal Rule of Civil Procedure 56 to overcome summary judgment and, therefore, that this claim is due to be dismissed.[14]

### B. Section 1981

Defendant claims that any disparate wage claim brought pursuant to § 1981 should be dismissed on summary judgment because: (1) Plaintiff cannot establish a prima facie case of disparate pay based on race as a matter of law; (2) Defendant has offered legitimate, non-discriminatory reasons for any pay differences; and (3) Plaintiff cannot prove that such reasons are pretextual. Finally, Defendant argues that this claim for wages paid prior to April 1996 must be dismissed because such claim is time barred. The court is not persuaded by Defendant's arguments.

As a threshold matter, the court notes that the Eleventh Circuit has explicitly concluded "that race based, discriminatory wage payments constitute a continuing violation...." *Calloway v. Partners Nat'l Health Plans*, 986 F.2d 446, 449 (11th Cir.1993). The Eleventh Circuit specifically held that "the violation exists every single day the employee works." *Id.* Accordingly, this court finds that Plaintiff's disparate wage claim constitutes a continuing violation and, therefore, is not time-barred.

Plaintiff proffers indirect evidence of disparate wage discrimination. (Pl.'s Resp. at 50.) Under these circumstances, a "plaintiff must prove by a preponderance of the evidence a prima facie case of discrimination." *Glover v. Kindercare Learning Centers, Inc.*, 980 F.Supp.

437, 446 (citing *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. 1817; *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981)). Adapting the *McDonnell Douglas* test "to allegations of discriminatory pay, [plaintiff] must establish the following: (1) that she belongs to a racial/sexual minority, (2) that she asked for and was qualified for a raise, (3) that despite her qualifications she was denied a raise, and (4) at the time she was denied additional compensation the pay of [comparable persons] of a different race and /or sex was higher than what she received." *Daniel v. Church's Chicken*, 942 F.Supp. 533, 538 (S.D.Ala. 1996). If Plaintiff satisfies the prima facie elements by a preponderance of the evidence, then a presumption of impermissible discrimination arises. *See Burdine*, 450 U.S. at 254, 101 S.Ct. 1089.

With the presumption, the burden of production shifts to the defendant employer to come forth with admissible evidence articulating a legitimate, nondiscriminatory reason for the adverse employment action "which, if believed by the trier of fact, would support a finding that unlawful discrimination was not a cause of the employment action." *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 507, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993). Plaintiff retains the burden of proving intentional discrimination. *See Burdine*, 450 U.S. at 253, 101 S.Ct. 1089. If the defendant/employer meets its burden of production, the presumption of intentional discrimination is rebutted and drops from the case. *See Hicks*, 509 U.S. at 510–511, 113 S.Ct. 2742.

"The case may continue, however, if the plaintiff presents some evidence, which may include the previously

14. Federal Rule of Civil Procedure 56 provides, in relevant part, that:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this rule, must set for the specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party.

Fed.R.Civ.P. 56(e).

produced evidence establishing the prima facie case, sufficient to permit a reasonable fact finder to conclude that he reasons given by the employer were not the real reasons for the adverse employment decision." *Glover,* 980 F.Supp. at 447 (citing *Combs v. Plantation Patterns,* 106 F.3d 1519, 1528 (11th Cir.1997), *cert. denied,* —— U.S. ——, 118 S.Ct. 685, 139 L.Ed.2d 632 (1998)). This may be done "either directly by persuading the court that a discriminatory reason more likely motivated the employer or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine,* 450 U.S. at 256, 101 S.Ct. 1089. "Because the plaintiff bears the burden of establishing pretext [for discrimination], [s]he must present 'significantly probative' evidence on the issue to avoid summary judgment." *Young v. General Foods Corp.,* 840 F.2d 825, 829 (11th Cir.1988) (quoting *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)). "Conclusory allegations of discrimination, without more, are not sufficient to raise an inference of pretext or intentional discrimination where [a defendant] has offered extensive evidence of legitimate, nondiscriminatory reasons for its actions." *Id.* at 830.

 First, the court finds that Plaintiff has satisfied her prima facie burdens. Plaintiff has established that she is black, that she was paid less than a white person in the same position, and that she was as qualified as the white person.

 Second, the court finds that Defendant has satisfied its burden of proffering a legitimate, non-discriminatory reason for any pay disparity. According to Defendant, such disparity was the result and reflective of performance evaluations. Sometimes Plaintiff's performance evaluations were lower than those of her white counterpart, and at those times, Plaintiff's pay was less than that of her white counterpart.

 Therefore, this case, like most disparate treatment cases, "turn[s] on the plaintiff's rebuttal." *Glover,* 980 F.Supp.

at 447. Plaintiff claims that the performance evaluations were "tainted by a sexual and or racial animus, and therefore, this reason is unworthy of credence." (Pl.'s Resp. at 52.) To support this contention, Plaintiff offers evidence that Henig had input into her evaluations. Further, Plaintiff contends that a question of fact exists concerning whether Barbaree, who had input into Plaintiff's evaluations, harbored any racial animus towards Plaintiff which reasonably could have affected Plaintiff's performance evaluations.

Based on the foregoing, the court finds that a genuine issue of fact exists concerning whether Defendant's proffered reason is pretextual. Therefore, summary judgment on this issue is due to be denied.

### ORDER

Based on the foregoing, it is CONSIDERED and ORDERED that Defendant's Motion For Summary Judgment be and the same is hereby GRANTED IN PART and DENIED IN PART as follows:

1. DENIED as to Plaintiff's claims of racial and sexual harassment pursuant to Title VII;

2. GRANTED as to Plaintiff's claim of racial harassment pursuant to 42 U.S.C. § 1981 for events occurring more than two years prior to the filing of Plaintiff's Complaint;

3. DENIED as to Plaintiff's claim of racial harassment pursuant to 42 U.S.C. § 1981 for events occurring within two years of the filing of Plaintiff's Complaint;

4. GRANTED as to Plaintiff's claim of retaliation brought pursuant to Title VII and 42 U.S.C. § 1981;

5. GRANTED as to Plaintiff's claim of disparate pay brought pursuant to Title VII;

6. DENIED as to Plaintiff's claim of disparate pay brought pursuant to 42 U.S.C. § 1981.

It is further CONSIDERED and OR-DERED that the following claims be and the same are hereby DISMISSED:

1. Plaintiff's claim of racial harassment brought pursuant to 42 U.S.C. § 1981 for events occurring more than two years prior to the filing of Plaintiff's Complaint;

2. Plaintiff's claims of retaliation brought pursuant to Title VII and 42 U.S.C. § 1981;

3. Plaintiff's claim of disparate pay brought pursuant to Title VII.